IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH  DIVISION

BP PRODUCTS NORTH AMERICA INC., )
                                )
                                )
        Plaintiff,              )
                                )
        v.                      )        Case No. 08-6038-CV-SJ-HFS
                                )
WALCOTT ENTERPRISES, INC. et al. )
                                )
        Defendants.             )

**MEMORANDUM AND ORDER**

Before the court is the motion of plaintiff, BP Products North America Inc., for partial

summary judgment. Plaintiff commenced this action against defendants, Walcott Enterprises, Kelly

B. Jones, and Steven W. Jones.[1] Plaintiff asserted a cause of action against Walcott in Count I of the

second amended complaint asserting breach of contract; in Count II plaintiff asserted a cause of

action against defendant Kelly B. Jones[2] for unlimited guaranty; in Count III plaintiff repeats this

_____

[1] On December 23, 2008, plaintiff sought, and was granted leave to file a second amended
complaint adding Northchase Development, Inc. as a defendant in this action and asserting a
claim of conspiracy to fraudulently transfer assets pursuant to the Missouri Uniform Fraudulent
Transfer Act (doc. 26). Plaintiff claims that defendant Steven W. Jones is Vice-President of
Northchase and one of the two members of its Board of Directors, and that he and defendant
Walcott conspired with Northchase to transfer service stations from Walcott to Northchase in
order to hinder plaintiff's ability to collect a monetary award. (Id). However, plaintiff does not
assert any claims against Northchase in the instant motion.

[2] Plaintiff has identified defendant Kelly B. Jones as the President of Walcott. (Second
Amended Complaint: ¶ 7). Subsequent to the filing of the partial summary judgment motion, on
June 24, 2009, defendant Kelly B. Jones, filed a notice of bankruptcy (doc. 56), stating that
Chapter 7 Voluntary Petition was filed in the United States Bankruptcy Court for the Eastern
District of Arkansas, Case No. 09-13919. Pursuant to 11 U.S.C. ¶ 362, the action is stayed as to
this defendant, and plaintiff's claim against this defendant will be denied without prejudice.

claim against Steven W. Jones; in Count IV plaintiff asserted a cause of action against all defendants for trademark and trade dress infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; in Count V plaintiff asserted a claim against all defendants for unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); in Count VI plaintiff asserted a claim against all defendants for unfair competition in violation of Missouri common law; and in Count VII plaintiff asserted a claim against all defendants for conspiracy to fraudulently transfer assets in violation of the Missouri Uniform Fraudulent Transfer Act, Mo. Rev. Stat. §§ 428.005 et seq. In the instant dispute, plaintiff seeks partial summary judgment against Walcott under Count I for breach of contract, and against Steven W. Jones under Count III of the second amended complaint asserting action on the unlimited guaranty.

## Background Facts

Defendant Walcott is a branded jobber which is a wholesaler that agrees to purchase gasoline, diesel fuel, and other petroleum products and then resells those products to the public. Defendant Steven W. Jones is an officer and/or agent of Walcott. Plaintiff states that Walcott agreed to purchase these products and then resell the products to the public at its own BP-branded stations or to other independent dealers.

## The Jobber Contracts

On April 12, 2002, plaintiff and Walcott entered into a three year Branded Jobber Contract, and on March 1, 2005, the parties entered into a second three year Branded Jobber Contract. Plaintiff agreed to sell petroleum products to Walcott, and agreed that Walcott could resell the products to others if Walcott remained in compliance with the terms of the Jobber Contract. The Jobber Contract

granted Walcott a non-exclusive limited license to use plaintiff's designated trademarks and trade and brand names. The Jobber Contract also provided that Walcott would indemnify plaintiff from all costs and expenses, including attorney's fees associated with any default or breach by Walcott.

In conjunction with the Jobber Contract, plaintiff provided financial incentives to Walcott through a Jobber Outlet Incentive Program "JOIP" and Branded Jobber Re-Image Program "JRP." The JOIP contracts provided for plaintiff to advance funds as incentive payments to qualifying jobbers to construct, improve or acquire a retail outlet that complies with plaintiff's image program and standards. The funds so advanced were amortized by the amount of gasoline sold at the retail outlets and any unamortized amounts were owed to plaintiff. The JRP contract provided for plaintiff to make payments to Walcott, directly or indirectly, for materials and labor for the re-image project. These payments were to be amortized over a seven year period based on a type "B" re-image received by Walcott.

On May 27, 1998, J.R. Oil Company, LLC entered into a JOIP contract for a retail store at I-35 and Highway 36, Cameron, Missouri. On July 19, 2000, with plaintiff's consent, J.R. Oil assigned the JOIP including all obligations for the Cameron location to Tank Management, Inc. On April 18, 2002, with plaintiff's consent, Tank Management assigned the JOIP contract including all obligations for the Cameron location to Walcott. Pursuant to the JOIP contract, plaintiff gave Walcott $20,454.53 in incentive payments. Pursuant to the JRP contract, plaintiff gave Walcott $35,859.76 in reimage payments.

On April 30, 2003, Walcott and plaintiff entered into a JOIP contract for a competitive conversion of a retail store located at 420 E. Kings Highway, Paragould, Arkansas. Plaintiff gave Walcott $53,719.51 in incentive payments. Also on April 30, 2003, plaintiff and Walcott entered into a JOIP contract for a competitive conversion of a retail store located at 360 E. Main, Piggott,

Arkansas. Plaintiff gave Walcott $65,331.50 in incentive payments. On the same date, plaintiff and Walcott entered into a JOIP contract for a competitive conversion of a retail store located at 406 S.W. Texas, Hoxie, Arkansas. Plaintiff gave Walcott $56,158.95 in incentive payments.

Plaintiff states that, in general, the JOIP contracts provided for it to advance funds as incentive payments to qualified jobbers who construct or improve a retail outlet that complied with plaintiff's image program. The funds are amortized by the amount of gasoline sold at the retail outlets and any unamortized amounts are owed to plaintiff. The contract further stated that by accepting incentive payments from plaintiff, Walcott agreed to comply with the image programs and standards at the retail sites for an uninterrupted period of ten years beginning upon receipt of the first payment. If for any reason during this period the retail outlet ceased to be an exclusive branded facility or ceased to conform to plaintiff's image standards, then Walcott would owe plaintiff, within thirty days notice of plaintiff's demand, a pro-rated amount based on the length of time in the program.

On January 14, 2003, plaintiff and Walcott entered into a JRP Contract for the retail outlet located at the Cameron site for a re-image of that location. In general, the contract provided for plaintiff to make payments to Walcott for materials and labor for the re-image project. The payments were to be amortized over a seven year period.

In accordance with the Jobber Contract Steven W. Jones executed an Unlimited Guaranty in order for plaintiff to lend money to Walcott. The Jones defendants, among other things, guaranteed payment to plaintiff when due. The Guaranties covered all existing and future indebtedness of Walcott to plaintiff, and in consideration thereof, plaintiff lent money to Walcott to build, modernize, and acquire jobber retail outlets.

On or about December 1, 2006, before the end of the ten year period in the JOIP contracts

and the seven year period in the JRP contract, plaintiff states that Walcott ceased operating the four gasoline stations, and no longer complied with plaintiff's image programs and standards. On April 9, 2007, plaintiff gave notice to Walcott and made demand for the amount owing of $231,524.30. Plaintiff states that Walcott has failed to pay, and that the Jones defendants, as guarantors of the amount due, have failed to pay.

Plaintiff's Additional Undisputed Material Facts

In contravention of Federal Rules, plaintiff filed additional facts in its reply brief. Although sanctions were not imposed, defendants were permitted an opportunity to respond. (Order dated June 17, 2009). Essentially, plaintiff included information garnered from the declaration of Frank Hernandez,[3] a Credit Analyst for plaintiff. (Reply Brief: Exh. 3). Hernandez averred that on April 2, 2004, he performed a Customer Credit Evaluation of Walcott and determined that Walcott was a high credit risk due to, among other things, the return of four drafts presented by Walcott in the previous nine months that were returned due to non-sufficient funds. (Id: ¶¶ 2-3). Since that time Walcott's payments for fuel purchases were returned as a result of non-sufficient funds on December

_____

[3]Defendants oppose the admittance of evidence provided by the declaration of Mr. Hernandez and claim that plaintiff failed to timely disclose him as a witness. (Defendants' Sur-Reply: pg. 9-10). Defendants seek additional time in order to depose this witness. (Id). Plaintiff, however, has provided documents demonstrating that Mr. Hernandez was identified in its Rule 26 Initial Disclosures on October 14, 2008 (Plaintiff's Sur Sur-Reply: Exh. 3), and, while improper, also included Hernandez's testimony in its reply brief filed on June 1, 2009. After giving defendants additional time to respond, and an extension of that time (docs. 55, 58), plaintiff contends that defendants had ample opportunity to depose this witness. (Plaintiff's Sur Sur-Reply: pg. 3-4).

10, 2004, February 18, 2005, May 10, 2006, and September 8, 2006. (Id: ¶¶ 6, 10, 14, 21).[4] In almost each instance, Walcott eventually paid the returned drafts. (Id: ¶¶ 11, 15, 23). Initially, Hernandez recommended that Walcott be issued a line of credit for $350,000, and that Walcott provide a Letter of Credit in that amount. (Id: ¶ 3). Because Walcott obtained a Letter of Credit in only $150,000, its credit limit was also $150,000. (Id: ¶¶ 4-5). In February of 2005, Walcott sought to defer payment for Image Billing Material due to a lack of cash flow, and by e-mail to Tyrone Evans, the Jobber Sales Manager for Walcott, dated February 3, 2005, Hernandez denied the request and expressed concern about Walcott's credit history. (Id: ¶¶ 7-8). The e-mail also advised Evans that in the event of another returned draft, Walcott would probably be placed on prepay status, or its present credit limit of $275,000 would be reduced to its Letter of Credit, i.e. $150,000. (Id: ¶ 9).

On March 31, 2005, and August 9, 2005, Hernandez performed a Credit Review and found Walcott to be an adequate credit risk. (Id: ¶¶ 12-13). After a credit review on May 31, 2006, Walcott was classified as probable default-secured, and its credit limit was reduced to $150,000, the amount of the Letter of Credit because of the May 10th return draft. (Id: ¶ 16). The classification as probable default-secured was determined after a credit review again on August 4, 2006, and although Hernandez received payment of most of the returned drafts on December 22, 2006, the decision had been made to place Walcott on prepay status. (Id: ¶¶ 20, 23). Although the $150,000 Letter of Credit was still in place, Hernandez advised Walcott on January 2, 2007, that credit could no longer be extended to it due to the number of returned fuel payments, and all fuel purchases would need to be prepaid. (Id: ¶¶ 24-25).

In February of 2007, plaintiff suspected Walcott of commingling motor fuel because

---

[4]Defendants claim that the reports of insufficient funds on February 18, 2005 and on May 10, 2006, were due to banking error. (Defendants' Sur-Reply: ¶¶ 10, 14).

although Walcott had not purchased any BP-branded motor fuel since November of 2006, it continued to process large sums of credit card transactions at its retail sites. (Id: ¶ 26). An audit result received the following month indicated that Walcott failed the audit, and on March 6, 2007, plaintiff terminated Walcott's Jobber Contract and the other related agreements. (Id: ¶ 27). Plaintiff could not call in the Letter of Credit at that time because it had expired on February 27, 2007. (Id: ¶ 28).

## Discussion

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Eastling v. BP Products North America, Inc., 2008 WL 4544435 * 2 (D.Minn). The evidence and inferences that may be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Id. However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.' " Id; citing, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Eastling, at *2. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Id. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. Id.

**II. Breach of Contract**

Plaintiff claims that a breach occurred when Walcott ceased operating the BP branded stations prior to the expiration of the JOIP and JRP contracts. Defendants essentially argue that plaintiff constructively terminated the contracts when it changed its prior policy and required Walcott to prepay before any petroleum products would be delivered.

The parties agree that they entered into a three-year Jobber Contract on April 12, 2002, and a second three-year Jobber Contract on March 1, 2005. The parties also agree that in conjunction with the Jobber Contract, plaintiff agreed to sell diesel fuel and other petroleum products to Walcott, and, in turn, Walcott agreed to resell those products to the public or to other independent dealers. Pursuant to the JOIP and JRP contracts, plaintiff provided financial incentives to Walcott as an incentive to Walcott to build or modernize its BP-branded stations. (Id: ¶¶ 11-12). Yet, defendants claim that a material question of fact exists as to whether appropriate consideration was given and whether the contracts were contracts of adhesion provided on a "take it or leave it" basis. Defendants appear to base this argument on the fact that plaintiff initially extended credit to Walcott, but then changed its custom and practice by requiring Walcott to prepay. In support of this argument, defendants point to the testimony of their prior jobber sales manager, Tyrone Evans, that he could not recall any other jobber in his sales territory whose credit had been revoked. (Opposing Suggestions: pg. 21; see also, Exh. 3: Tyrone Evans Depo. Pg. 34). Contrary to defendants' contention, "Missouri courts do not 'view adhesion contracts as inherently sinister and automatically unenforceable.' " Herd v. American Sec. Ins. Co., 556 F.Supp.2d 992, 1000 (W.D.Mo. 2008) (quotation and citation omitted)(in Missouri, adhesion contracts are not automatically unenforceable,

rather courts seek to enforce the reasonable expectations of the parties).[5] Additionally, it has long been settled in Missouri that absent a showing of fraud, a party who is capable of reading and understanding a contract is charged with the knowledge of that which he or she signs. Monsanto Co. v. Vanderhoof, 2007 WL 1240258 *7 (E.D.Mo.). Defendants do not argue that the contracts were entered into under duress, or due to fraud, and there is no evidence to support such a claim. In his affidavit, Steven Jones averred that he is an experienced businessman with more than 20 years experience working in the retail petroleum sales industry. (Opposing Suggestions: Exh. 1, ¶ 2). Thus, he is charged with the knowledge of the contracts he signed, and defendants' claim that there exists a material issue of fact as to whether the parties entered into a valid contract fails.

As to a breach of the contracts, defendants admit that on or about December 1, 2006, some months before the formal termination, Walcott ceased operating the four gasoline stations (Opposing Suggestions: ¶ 30). However, they claim that by implementing the changed credit policy, plaintiff was the first to breach.

Pursuant to par. 4(a) of the Jobber Contract, plaintiff was not obligated to extend credit to defendants, but in the event credit was extended, it would be subject to plaintiff's established credit terms as amended from time to time. (Suggestions in Support of Summary Judgment: Exh. 1, par. 4(a)). The contract also provided that plaintiff reserved the right to change the credit terms at any time for either the class of trade generally or for an individual jobber, especially where a check or electronic funds transfer was presented and dishonored due to nonsufficient or uncollected funds.

_____

[5]There is nothing inherently unreasonable in requiring prepayment by a purchaser deemed to be a credit risk. While I can take judicial notice of this business reality I note a judicial reference to "cash prepayment status" imposed by an apparently related company as a penalty on defaulting dealers. Harper v. BP Exploration & Oil Inc., 134 F.3d 371, 1998 WL 45487 (6th Cir.) Op. *12 (Dissent). Appraisal of good business judgment in this context is not a matter for me or a jury.

(Id). Clearly, plaintiff had a contractual right to modify the payment arrangement. Thus, defendants'
argument, without more, is insufficient to defeat the motion for partial summary judgment as it
relates to the element of a breach.


A.    Petroleum Marketing Practices Act

Defendants also claim that a breach occurred because plaintiff acted in violation of the
Petroleum Marketing Practices Act "PMPA" by constructively terminating the parties' contracts
without providing defendants 90 days notice. Defendants state that while they are not asserting a
claim under the PMPA, they do assert it as an affirmative defense. Plaintiff responds that even were
a claim for constructive termination be found to exist, it would be barred by the one year statute of
limitations. Plaintiff further notes that few circuits recognize a cause of action for constructive
termination pursuant to the PMPA.

The PMPA was enacted by Congress after it found out that there was a significant disparity
in the bargaining power wielded by the parties to motor fuel franchises. Aldrich v. Amoco Oil Co.,
1985 WL 6098 * 2 (S.D.Iowa). The more powerful franchisors were commonly using threats of
termination and nonrenewal to compel franchisees to comply with their marketing policies. Id. This
sort of coercion was seen as having an adverse impact on the nation's motor fuel distribution and
marketing industry. Id. The PMPA establishes uniform, minimum standards governing the
termination or nonrenewal of motor fuel franchises. Id. The purpose of the PMPA was to eliminate
terminations and nonrenewals of motor fuel franchises for arbitrary and discriminatory reasons. Id.

However, Congress did not intend that the PMPA constitute an undue burden on the
legitimate business interests of franchisors. Id, at * 3. Rather, Congress sought to limit the PMPA
so as not to unduly restrict franchisors' ability to adapt to the changes in the industry and the motor

fuel market. Id. The type of "termination" Congress sought to eliminate in the PMPA was an "extreme" act, one that punished the franchisee without benefitting the franchisor. Id.

In considering the conduct of plaintiff at bar in requiring advance pay from Walcott, a committee report on the PMPA is useful. Midwest Petroleum Co. v. American Petrofina Marketing, Inc., 635 F.Supp. 815, 821 (E.D.Mo. 1986). One test is whether the determination was made in "good faith" which is meant to preclude sham terminations from being used as an artifice for termination or non-renewal. Id. The second test is whether the determination was made "in the normal course of business." Id. Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. Id. Here, defendants have failed to provide any evidence that plaintiff acted inappropriately in conducting credit reviews of Walcott or that instituting a credit change requiring Walcott to submit cash in advance of an oil delivery would not be viewed as a normal business practice in light of the returned fuel payments. Doyle v. Phillips Petroleum Co., 527 F.Supp. 153 (D.C.Ark. 1981).

The Eighth Circuit has not addressed the issue of constructive termination or constructive nonrenewal of a petroleum franchise in conjunction with the PMPA. Alford's Service, Inc. v. Sinclair Oil Corp., 2003 WL 22996911 * 5 (D.Minn.). However, based on the express provisions of the Jobber Contract, Walcott has failed to show that a constructive termination took place. Harara v. Conoco Phillips Co., 377 F.Supp.2d 779, 790 (N.D.Cal.. 2005); citing, April Mktg. & Distrib. Corp. v. Diamond Shamrock Ref. & Mktg. Co., 103 F.3d 28, 30-31 (5th Cir. 1997) (holding that a claim for constructive termination does not exist where the franchisor has acted within its rights under the franchise). Moreover, the Ninth Circuit has held that even assuming that a constructive termination claim is actionable under the PMPA, the plaintiff has not submitted sufficient evidence to establish that the defendant violated the franchise agreement. Harara v. Conoco Phillips Co., 377

F.Supp.2d 779, 790 (N.D.Cal. 2005); see also, Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California, 153 F.3d 938, 948 (9th Cir. 1998) (the Ninth Circuit has not determined whether a claim for constructive termination exists under the PMPA, and I need not decide the issue here).

Other courts have recognized that in order to establish a constructive nonrenewal, the plaintiff-dealer would have to demonstrate a breach of at least one of three statutory components of a franchise agreement. Id. The three elements include a contract to use the refiner's trademark, a contract for motor fuel supply, and a lease of the dealer premises. Id; citing, Dersch Energies, Inc. v. Shell Oil Co., 314 F.3d 846, 860 (7th Cir. 2002). Defendants do not contend, and there is no evidence to support a claim that plaintiff breached a contract for use of the refiner's trademark or a lease of the dealer premises, and as previously noted, the Jobber Contract expressly permitted a change in credit terms upon the presentment and dishonor of payments made by Walcott.


B.    Damages

Defendants claim that plaintiff has not provided sufficient proof of its damages because: (1) one of the location sites used by plaintiff in its damages calculation was not owned by Walcott: (2) the damages calculated by plaintiff were not actually reviewed by Evans; and (3) there is a disputed issue of material fact as to whether CRIND payments must be repaid. According to defendants, there is a discrepancy about the location of the Cameron site as well as a store located at that site and identified by plaintiff as Jones Travel Plaza which defendants claim they do not own. Defendants point to the JOIP Contract that indicates the Cameron site located at Missouri I-35 and Highway 36 (Plaintiff's Exh. 2 of Supporting Suggestions), and state that the Jones Travel Store is located at 2108 East Highway 38. While there is a discrepancy as to whether the Cameron site is located on Highway 36 or Highway 38, plaintiff states that it is nothing more than a typographical error. The

Jobber Contract executed by the parties on March 1, 2005, expressly identifies the Cameron site located at 2108 E. Highway 36 (Complaint: Exh. 1), and the JRP Contract executed by the parties on January 14, 2003 (Plaintiff's Exh. 8 of Supporting Suggestions) mirrors this address. Moreover, Schedule R attached to this contract expressly refers to the Jones Travel Store. (Id). Walcott's ownership is not a prerequisite for being obligated to repay loans. Consequently, defendants' argument that this location should not be considered in the calculation of damages owed is unpersuasive.

Defendants also dispute whether there is sufficient proof of the damages submitted by plaintiff in reliance on Evans who testified that he did not personally calculate the amounts and did not review all of the financial documents relied upon by BP employee Angie Burns in computing the amounts. Defendants claim that in the absence of this review by a supervisor there is a lack of sufficient evidentiary support. In response, plaintiff points to Evans Declaration in which he averred that the amount owed to plaintiff is $231,524.25. (Supporting Suggestions: ¶ 33). Except as here discussed, defendants do not specify questions about this figure. In addition, Lydia E. Minerva, a sales analyst with BP averred that she began handling the Walcott account in July of 2008, and personally reviewed the documents in the Walcott file regarding calculation of the unamortized incentive and reimage funds. (Reply Brief: ¶¶ 2, 4). After a detailed analysis of the payments made to Walcott for a variety of purposes including CRINDS set up, image contributions and fuel incentives, Ms. Minerva concluded that the total unamortized amount due at the time of the debranding for: (1) the Paragould site totaled $53,719.51; (2) the Piggott site totaled $65,331.50; (3) the Hoxie site totaled $56,158.95; and (4) the Cameron site totaled $20,454.53 and the unamortized amount for reimage funds at the Cameron site due at the time of debranding totaled $35,859.76. (Reply Brief: ¶¶ 10-23). These amounts total $231,524.25, the amount sought by

plaintiff in this motion - and within a nickel of the demand in April, 2007.

The analysis submitted by plaintiff provides sufficient evidentiary support for its damages claim. Defendants oppose this testimony due to plaintiff's failure to timely disclose this witness. (Defendants' Sur-Reply: pg. 9). Plaintiff shows, however, that in an email to defendants dated May 14, 2009, it identified Ms. Minerva, and advised counsel of the documents provided by her in support of its argument presented in its reply brief. (Plaintiff's Sur Sur-Reply: pg. 2-3; Exh. 3).

If defendants had seriously wished to depose Ms. Minerva there was plenty of opportunity to do so earlier, by agreement or by permission of the court. Assuming defendants are correct in questioning the Evans proof, I rely on the Minerva proof for present purposes.[6] See, United States v. Sayer, 450 F.3d 82, 88-90 (1ˢᵗ Cir. 2006) and Nader v. Blair, 549 F.3d 953, 963 (4ᵗʰ Cir. 2008).

Finally, defendants claim that the CRIND payments are not considered part of the "competitive conversion" incentive payments to be reimbursed. This argument is based on the affidavit of Kelly Jones who points to "his understanding" that CRIND payments were not considered part of the competitive conversion incentive, and, therefore, were not reimbursable. (Opposing Suggestions: Exh. 2, ¶ 14).

Each JOIP Contract provides that in the event a jobber terminates the contract prior to the stated expiration date, an "Early Termination Sum" would be assessed that would include, among other things, the aggregated and unamortized sums of any incentive funds provided to the jobber. (Supporting Suggestions: Exh. 1, ¶ 16(g)). Further, in each JOIP Contract, with the exception of the Cameron site, a pay express system called CRINDS payments "card readers in dispensers" were

---

[6]Since this ruling does not close the case, any significant procedural or substantive error that defendants believe has been made by the court can be reconsidered on motion. By this invitation I assume counsel, who can always file an appeal, will not ask me to engage in wasteful reconsideration of issues here decided.

defined as an incentive program. (Supporting Suggestions: Exh. 2, ¶¶ 1, 3, 5). Further, and contrary to Kelly Jones' stated belief, he acknowledged and initialed the CRINDS provisions of the JOIP Contracts for the Paragould, Piggott, and Hoaxie sites indicating that CRINDS were part of a competitive conversion. (Supporting Suggestions: Exh. 5, ¶ 1(b); see also, Exh. 6, and Exh. 7). A subjective "understanding" does not change contractual terms absent a supporting theory based on facts.

In sum, the evidence submitted by plaintiff in the form of affidavits, declarations, and the contracts demonstrates that there are no genuine issues of material fact, and plaintiff is entitled to partial summary judgment on its damage claim against Walcott for breach of contract.

## III. Unlimited Guaranty

In Count III of the second amended complaint, plaintiff alleges that on April 18, 2002, Steven W. Jones executed an unlimited guaranty, and in return, plaintiff provided loans and extended other financial accommodations to Walcott. (Complaint: ¶ 37). Plaintiff alleges that this agreement was signed again on April 11, 2005. (Id: ¶ 38). Defendants claim that plaintiff is not entitled to summary judgment on this claim because of absence of proof of reliance, and a purported by verbal communication that plaintiff would continuously provide credit to defendants for the purchase of petroleum based products. Defendants' claim reliance on this representation that on-going credit would be provided for the duration of the contracts. Defendants allegations of a verbal agreement are conclusory impressions, insufficient to defeat summary judgment. Moreover, under Missouri law, "Extrinsic evidence of a prior or contemporaneous agreement is generally not admissible to vary, add to, or contradict the terms of an unambiguous and complete written document." Rosemann v. Roto-Die, Inc., 377 F.3d 897, 901 (8th Cir. 2004). The underlying

agreement plainly contradicts an understanding like that asserted. Exh. 1, ¶ 4(a), in support of plaintiff's motion. Jones does not specify any subsequent contractual event, but rather seems again to be asserting an "understanding" and reliance on past conduct. Defendants again claim that if plaintiff's actions violated the PMPA, it should be estopped from recovering under the personal guaranties. For the reasons stated above in the breach of contract claim, there is no genuine issue of material fact regarding a PMPA violation.

In order to recover on a guaranty contract in Missouri, the creditor must show: (1) that the defendant executed the guaranty; (2) that the defendant unconditionally delivered the guaranty to the creditor; (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor; and (4) that there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover. United Stationers Supply Co. v. Office Solutions, Inc., 2005 WL 1923434 * 2 (E.D.Mo.); citing, ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 382 (Mo. banc 1993).

The guaranty contracts demonstrate that Steven W. Jones executed the guaranty contracts unconditionally, and the undisputed evidence shows that the guaranties were an explicit inducement for extending credit to Walcott. Plaintiff has also presented sufficient evidence showing that a sum of money is owed that is covered by the guaranties. By the terms of the guaranty, Steven W. Jones agreed to satisfy any and all indebtedness, including interest, and to pay all expenses including attorneys' fees incurred by plaintiff in collecting the debt and enforcing the guaranties. (Supporting Suggestions: Exh. 9). Thus, plaintiff has shown all the necessary elements to recover under the guaranties, and summary judgment on this claim is appropriate.

Accordingly, it is hereby

ORDERED that plaintiff's motion for partial summary judgment (ECF doc. 31) is GRANTED in part and DENIED in part. Plaintiff's motion for partial summary judgment in the specified amount as to Count I of the second amended complaint alleging breach of contract against defendant Walcott is GRANTED. Plaintiff's motion for partial summary judgment as to Count II of the second amended complaint alleging action on the unlimited guaranty against defendant Kelly B. Jones cannot be definitively ruled because of bankruptcy and is therefore DENIED without prejudice. Plaintiff's motion for partial summary judgment as to Count III of the second amended complaint alleging action on the unlimited guaranty against defendant Steven W. Jones is GRANTED.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September  30 , 2009

Kansas City, Missouri